Q. I. Roberts v. Commissioner. Virginia S. Roberts v. Commissioner. Q. I. Roberts v. Commissioner.
Roberts v. Commissioner
Docket Nos. 15773, 15774, 15775.
United States Tax Court
1949 Tax Ct. Memo LEXIS 289; 8 T.C.M. (CCH) 60; T.C.M. (RIA) 49013; January 19, 1949
*289 Petitioners, husband and wife, acquired a Chevrolet dealership in November 1938 which they incorporated as the Roberts Chevrolet Company on August 10, 1939. This business was operated by them until April 1, 1942, when it was succeeded by Stewart Chevrolet Company, a partnership in which Roberts Chevrolet Company and J. W. Stewart, Jr., each owned a one-half interest. Stewart's interest was acquired by petitioners on August 1, 1944 and the business thereafter was conducted as a partnership between the Roberts Chevrolet Company and petitioners under the name of Roberts Chevrolet. On November 30, 1944, Roberts Chevrolet Company, the corporation, was dissolved and all of its assets conveyed to the petitioners. During the latter part of 1940 and the first part of 1941, the husband, individually and as a member of two partnerships, realized total earnings of $21,754.63 from the rental and sale of motor vehicles used in the construction of a nearby army base. Over the same period petitioners each received the sum of $22,240.10, representing income from a third partnership engaged in the same type of business. From 1938 through 1944, petitioners purchased extensive acreage and engaged *290 in the business of buying, raising, and selling cattle. Held.. 1. That throughout the entire corporate existence of Roberts Chevrolet Company petitioners each owned an undivided one-half interest in the business and the capital gain realized on its dissolution may properly be divided equally between them for income tax purposes. 2. That the respondent erred in his determination that $275.55, representing the income of Roberts Chevrolet, a partnership, distributed to the wife in 1944, was taxable to the husband in that year. 3. That the amount of $21,754.63 realized by the husband individually and as a member of two partnerships may not be included in the taxable income of the Roberts Chevrolet Company for 1941 under the provisions of section 45 of the Internal Revenue Code. 4. That the respondent erred in his determination that the $21,754.63 received by the husband in 1941 constituted a taxable dividend of $18,054.49 and a return of capital in the amount of $3,700.14 from Roberts Chevrolet Company in that year. 5. That the wife was not a bona fide partner for Federal income tax purposes in the third partnership and the $22,240.10 distributed to her *291 by that partnership in 1941 was properly included by the respondent in the taxable income of her husband for 1941. 6. Petitioners each owned an undivided one-half interest and were bona fide partners in the business of the cattle ranch from its inception in 1938 through 1944. Olin A. Watts, Esq., and W. A. Hamilton, Jr., Esq., Barnett Nat'l Bank Bldg., Jacksonville, Fla., for the petitioners. Newman A. Townsend, Jr., Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: These cases were consolidated for trial and decision upon motion of the petitioners. In Docket Nos. 15773 and 15774, the following deficiencies were determined against Q. I. Roberts and Virginia S. Roberts, respectively, as transferees of the Roberts Chevrolet Company: for the fiscal year ended *292 November 30, 1941, deficiencies in income taxes of $3,381.90, declared value excess profits taxes of $1,840.11, and excess profits taxes of $3,622.73; for the fiscal year ended November 30, 1944, an income tax deficiency of $137.79. In Docket No. 15775, respondent determined deficiencies against Q. I. Roberts individually in income taxes for the years 1941, 1943, and 1944 of $11,129.68, $1,990.82, and $762.48, respectively. Due to the provisions of the Current Tax Payment Act of 1943, petitioner's 1942 tax liability is also involved in Docket No. 15775. The following issues are involved: (1) Was the respondent correct in determining that Q. I. Roberts' taxable income for 1944 should be increased $3,443.52 because of capital gain realized by him upon the dissolution of Roberts Chevrolet Company in that year? (2) Did the respondent properly determine that taxable income of Q. I. Roberts for 1944 should be increased in the amount of $275.55 on the basis that he received dividends in that amount in that year from Roberts Chevrolet Company? (3) Was respondent correct in determining that the taxable income of Roberts Chevrolet Company for the fiscal year ending November 30, 1941, should *293 be increased, under the provisions of section 45 of the Internal Revenue Code, in the amount of $21,754.63 which represented the profits realized by Q. I. Roberts from the rental and sale of motor vehicles individually and as a member of two partnerships in that year? (4) Was respondent correct in his determination that of the $21,754.63 the sum of $18,054.49 constituted a taxable dividend received by Q. I. Roberts in 1941 and that the remaining $3,700.14 represented a return of capital which would serve to reduce the cost basis of the stock he owned in Roberts Chevrolet Company? (5) Was the respondent correct in increasing the taxable income of Q. I. Roberts for 1941 in the amount of $22,240.10 on his determination that Virginia S. Roberts was not a bona fide partner in a partnership known as "H. L. Lynch, Gustafson Motor Company, J. P. Hall, Q. I. Roberts, and Virginia S. Roberts"? (6) Was the respondent correct in determining that Virginia S. Roberts was not a bona fide partner with the petitioner during 1942, 1943, and 1944 in the operation of the Roberts Cattle Ranch? A number of other issues raised in the pleadings have been conceded or adjusted *294 by the parties and effect will be given thereto under Rule 50. Findings of Fact Issues Nos. 1 and 2 During the calendar years 1941 to 1944, inclusive, Q. I. Roberts, hereinafter sometimes referred to as the petitioner, and Virginia S. Roberts were residents of Green Cove Springs, Florida. For each of the said years they filed separate income tax returns on the cash and calendar year basis with the collector of internal revenue for the district of Florida. During the fiscal years ended November 30, 1941, and November 30, 1944, Roberts Chevrolet Company was a corporation organized and existing under the laws of the State of Florida with its principal place of business at Green Cove Springs, Florida. For each of such fiscal years its tax returns were filed with the collector of internal revenue for the district of Florida. Q. I. Roberts and Virginia Stanton Roberts were married at Palatka, Florida, on October 24, 1934. Q. I. Roberts was 23 and Virginia was 21 years of age at the time of their marriage. After finishing high school in Palatka, Virginia attended Florida State College for Women for one year and thereafter a business college in Washington, D.C. At both schools *295 her principal subject was accounting. In the spring of 1932 Virginia returned to Palatka and was employed by The Romines Chevrolet Company as its bookkeeper until the company went into bankruptcy in September, 1932. The St. John's Chevrolet Company which acquired the Chevrolet franchise in Palatka employed Virginia in December, 1932, and placed her in charge of its books. Petitioner graduated from the University of Florida in June of 1934 and was employed by a grocery company in Palatka. At the time of her marriage Virginia had managed to accumulate from her earnings the sum of $25 which was on deposit in a savings account under her name in the Palatka Atlantic National Bank. This money, which constituted the only money she and petitioner possessed at this time, was transferred to a joint savings account opened in their names. In June, 1935, petitioner was employed by the General Motors Acceptance Corporation. At this time he received a salary of $115 per month and Virginia was receiving $35 per week from the St. John's Chevrolet Company. By December 31, 1936, petitioner and Virginia had saved a balance of $1,223.72 which was on deposit in their joint savings account at the *296 Palatka Bank. These savings were accumulated by pooling the salaries of both, and after paying all their living expenses, depositing the balance in this account. Virginia alone was authorized to draw on this account. In January, 1937, they moved to Jacksonville where petitioner was sent by G.M.A.C. after he was promoted to credit man. Virginia thereafter took a job as bookkeeper with the Downtown Chevrolet Company at Jacksonville where she was placed in complete charge of the business records. In September, 1937, E. W. Williams, who, with H. C. Richard, owned Palatka Motors, the Oldsmobile and Buick agency in Palatka, made an offer to petitioner and Virginia to sell them a one-third interest in the dealership for $2,500 and pay them a joint salary of $200 per month if they would take over the management of the business. They accepted this offer and returned to Palatka. In addition to their joint savings account at the Palatka Bank, petitioner and Virginia had opened a joint checking account in the same bank. There was no money on deposit in this latter account prior to a deposit of $1,000.75 made on September 11, 1937. The sum so deposited was in part money withdrawn from the *297 savings account and in part money obtained from the sale of their car. An additional sum of $1,000 was deposited on September 13, 1937, in the joint checking account as a result of a loan obtained by them from Mrs. Ethel Roberts, the petitioner's mother. This money was loaned to petitioner and Virginia jointly and was to be repaid out of their joint earnings at the rate of $75 per month. This loan was paid off in 1940. Two checks of $1,000 each were written on that account and delivered to H. C. Richard and E. W. Williams in part payment of the purchase price of $2,500. The balance of the purchase price was paid by two promissory notes, each for $250, one payable to Richard and the other to Williams. These notes were signed only by the petitioner. At Palatka Motors petitioner supervised sales and Virginia supervised the keeping of records and other office work. In the spring of 1938, Palatka Motors was merged with St. John's Chevrolet and the $2,500 equity of petitioner and Virginia in Palatka Motors was transferred to St. John's Chevrolet. In the latter part of 1938, St. John's Chevrolet acquired the Chevrolet franchise at Green Cove Springs, Florida. Shortly thereafter petitioner *298 and Virginia sold their interest in the St. John's Chevrolet Company to O. R. Williams, a brother of E. W. Williams, for $2,500 and this sum was deposited in a joint checking account opened at the Bank of Green Cove Springs in the name of "Roberts Chevrolet Company." On November 29, 1938, a check in the amount of $500 was drawn on this account to purchase the assets of the Green Cove Springs dealership from St. John's Chevrolet. Roberts Chevrolet Company conducted an automobile sales and service business and engaged in the selling of new and used cars, parts, and maintained a repair business. Approximately four mechanics and one salesman, James W. Stewart, Jr., were employed. Virginia managed the office and was in complete charge of the books and records and invoiced new and used cars to customers. She sold parts over the counter and was in charge of collecting accounts and handling the finance contracts with General Motors. She obtained credit ratings on customers and made the necessary arrangements with G.M.A.C. so the latter company could purchase the finance contracts. She had charge of the company's bank account, received and deposited the funds of the business and wrote most *299 of the checks. She had the authority to hire and fire the company's employees. She purchased the supplies for the business, handled the correspondence and prepared the financial statements. Q. I. Roberts handled the outside work, the sale of new and use cars, and the servicing and repair work. From the inception of the business in November, 1938, both petitioner and Virginia devoted their entire time to the dealership. They opened the business at eight o'clock in the morning and closed it at six o'clock in the afternoon. When construction was started on the nearby army base at Camp Blanding in Florida, in October, 1940, petitioner was obliged to spend all of his time at Camp Blanding in connection with certain business ventures there. From October, 1940, until the summer of 1941, Virginia worked at the dealership from eight o'clock in the morning until ten or eleven o'clock each night and also nearly every Sunday doing work which her husband formerly had done, as well as her own. Virginia worked full time at the business until the very day her first child was born on August 30, 1941. She returned in the middle of October, 1941, and thereafter continued working in the agency until *300 the time her second child was born on August 15, 1943. After the birth of her second child, she stayed at the Roberts Cattle Ranch, going to Green Cove Springs to supervise the operation of the business whenever necessary. However, during this period she kept the books and records at the ranch and took part in the management of the dealership. In September, 1944, she returned to the dealership in Green Cove Springs and thereafter devoted her full time each working day to the business. Roberts Chevrolet Company was incorporated as a Florida corporation by Q. I. Roberts, Virginia S. Roberts, and Ethel Roberts on August 10, 1939. It was decided to incorporate the dealership, as petitioner and Virginia, subsequent to its acquisition in November, 1938, had entered into the cattle business. Upon the advice of A. G. Shands, who acted as a financial adviser to petitioner and Virginia, the corporation was formed to protect both the Chevrolet business and the cattle ranch from the creditors of the other should one of the businesses encounter financial difficulties. Some time prior to August, 1939, Q. I. Roberts went to Thomas J. Rivers, an attorney of Green Cove Springs, and requested Rivers *301 to prepare the papers necessary for incorporating the dealership. No information was given to Rivers at this time by the petitioner concerning the number of shares to be issued to each. Rivers, prior to this time, had never incorporated a business. He went to an older lawyer in Green Cove Springs and borrowed a form of Articles of Incorporation that had been drawn for a similar business. The Articles prepared by Rivers for Roberts Chevrolet Company stated that Q. I. Roberts had subscribed for 23 shares, Virginia S. Roberts, one share, and Mrs. Ethel Roberts one share. This stock allocation was made upon Rivers' own determination, without the advice of either Q. I. or Virginia Roberts. The Articles of Incorporation were signed by the incorporators in Rivers' presence without either of them reading the document or Rivers informing them of its contents. The original stock subscription agreement, which is undated, recites that Q. I. Roberts subscribed and paid for 23 shares of stock and that Ethel Roberts and Virginia S. Roberts subscribed and paid for one share each. Corporate minutes of a meeting held on August 7, 1939, show that Q. I. Roberts, Virginia S. Roberts, and Ethel Roberts *302 were elected directors and minutes of the first meeting of the board of directors held on August 14, 1939, indicate that Q. I. Roberts was named president; Mrs. Ethel Roberts, vice-president; and Virginia S. Roberts, secretary and treasurer. The minutes of a stockholders' meeting, dated June 4, 1940, stated that Q. I. Roberts held 23 shares of stock and Ethel Roberts and Virginia S. Roberts held one share each. The minutes for these various meetings were not prepared by Rivers at the time they occurred but were prepared some time within a year after the Articles of Incorporation were signed. These documents were not signed by the parties until September, 1943, when petitioner and Virginia went to Olin E. Watts, attorney, with respect to amending the Articles of Incorporation. Roberts Chevrolet Company filed corporation income tax returns for the fiscal years ended November 30, 1939, through November 30, 1944, inclusive, which represented a stock ownership as follows: Fiscal Year Ending:
November 30, 1939
No person owns more than 50 per cent of stock
November 30, 1940
All voting stock owned by Q. I. Roberts
November 30, 1941
92 per cent of stock, acquired May 15, 1941, owned by Q. I. Roberts
November 30, 1942
More than 50 per cent of voting stock owned by Q. I. Roberts
November 30, 1943
More than 50 per cent of voting stock owned by Q. I. Roberts
November 30, 1944
100 per cent of voting stock owned by Q. I. Roberts and Virginia
S. Roberts
*303 The capital investment made by petitioner and Virginia in Roberts Chevrolet Company amounted to $4,200. The $2,500 which was paid into the company upon its inception in November, 1938, actually amounted to a capital investment of $2,000 as the Roberts Chevrolet Company assumed two notes of $250 each which had been given to E. W. Williams and H. C. Richard by Q. I. Roberts as part payment for the one-third interest he and Virginia purchased in Palatka Motors. Since the inception of the business, an account captioned "No. 220a-Q. I. Roberts" was carried on the books of Roberts Chevrolet Company. When the joint checking account of petitioner and Virginia needed money, a check would be drawn on the company. Whenever the company was in need of working capital, they would deposit in Account 220a various sums from their joint checking account. As of April 30, 1941, Account 220a showed a balance of $2,217.46 owing by the company to Q. I. Roberts. On May 15, 1941, $2,200 of this balance was transferred from Account 220a to the credit of "Capital Stock Outstanding". No stock certificates however were issued at this time. Initially, Q. I. Roberts was paid a salary of $50 per week by Roberts *304 Chevrolet Company and Virginia received $25 per week. In the latter part of 1940, their respective salaries were increased to $100 and $50 per week. On or about January 14, 1939, they opened a joint savings account in the Bank of Green Cove Springs. For some time thereafter Q. I. Roberts' salary was used to defray their living expenses and Virginia's salary was deposited in this account. On April 1, 1942, the Chevrolet sales and service business operated by Roberts Chevrolet Company was transferred to Stewart Chevrolet Company, which was a partnership in which Roberts Chevrolet Company and James W. Stewart, Jr., a former employee of Roberts Chevrolet Company, each owned a half interest. The franchise then held by Roberts Chevrolet Company was reissued to the Stewart Chevrolet Company. The partnership maintained books and a bank account separate from Roberts Chevrolet Company. Virginia kept the books and supervised the office work at Stewart Chevrolet Company and received a salary $300of a year. Q. I. Roberts was not active in the operation of Stewart Chevrolet and drew no salary from the business as he had moved to the cattle ranch in February, 1942, and devoted most of his time *305 thereafter to ranch operations. Stewart died on July 31, 1944, and Stewart Chevrolet Company was succeeded by another partnership known as Roberts Chevrolet, in which Q. I. Roberts and Virginia each owned a 25 per cent interest and Roberts Chevrolet Company, the corporation, owned a 50 per cent interest. Stewart's interest in Stewart Chevrolet was purchased from his estate by Q. I. and Virginia for $3,291.52. On September 1, 1944, the directors of Roberts Chevrolet Company held a meeting and authorized the issuance of Stock Certificate No. 1 for 25 shares to Q. I. Roberts and Certificate No. 2 for 25 shares to Virginia S. Roberts. These shares were issued as of that date. On or about November 30, 1944, and in pursuance of a plan of liquidation adopted on that date, Roberts Chevrolet Company transferred all of its property and assets to Virginia S. Roberts and Q. I. Roberts in return for the surrender and cancellation of the shares of stock in Roberts Chevrolet Company which Virginia S. Roberts and Q. I. Roberts owned therein. Under date of November 30, 1944, Roberts Chevrolet Company executed and acknowledged a bill of sale as seller to Q. I. Roberts and Virginia S. Roberts as *306 purchasers, acknowledging the sale, transfer and delivery of all the personal property of every kind and description then owned and held by the corporation, said bill of sale reciting that it was made pursuant to the plan of liquidation of the corporation effective on that date. The fair market value of the property and assets distributed by Roberts Chevrolet Company on or about November 30, 1944, to its stockholders, Virginia S. Roberts and Q. I. Roberts, in exchange for and in cancellation of all the outstanding stock of said corporation pursuant to a plan of liquidation effective November 30, 1944, amounted to $19,054.03. Roberts Chevrolet filed a partnership income tax return for the period August 1, 1944, to November 30, 1944, which disclosed the following net income and distributions: Net income
$2,602.22
Distributions: Q. I. Roberts - salary
$1,200.00
Q. I. Roberts - 25% profits
275.56
1,475.56
Virginia S. Roberts - salary
$ 300.00
Virginia S. Roberts - 25%
profits
275.55
575.55
Roberts Chevrolet Co. (50% of
profits)
551.11
Total
$2,602.22
Deficiencies in income tax for the taxable year ended November 30, 1944, in the amount *307 of $137.79 were determined in Docket Nos. 15773 and 15774 against Q. I. Roberts and Virginia S. Roberts as transferees of the Roberts Chevrolet Company. These deficiencies were based upon respondent's determination that the $551.11, which represented the profits of Roberts Chevrolet distributed in 1944 to Q. I. Roberts and Virginia S. Roberts, was taxable in that year to the Roberts Chevrolet Company under the provisions of section 45 of the Internal Revenue Code. This deficiency is not contested by the petitioners herein. In Docket No. 15775, the deficiency notice states that the $551.11 which was distributed as partnership income to both Q. I. Roberts and Virginia S. Roberts in 1944 represented a taxable dividend received by Q. I. Roberts from Roberts Chevrolet Company in that year. Inasmuch as he had already reported $275.56 of this amount on his 1944 income tax return, the remaining $275.55 was added by respondent to Q. I. Roberts' net income for the taxable year ended December 31, 1944. In the deficiency notice in Docket No. 15775, the entire amount of the capital gains resulting from the liquidation of Roberts Chevrolet Company in 1944 was held taxable *308 to Q. I. Roberts, increasing his taxable income for 1944 in the amount of $3,433.52. The parties herein stipulated that if additional income, declared value excess profits or excess profits taxes are determined to be owing by Roberts Chevrolet Company for the fiscal years ending November 30, 1941, and November 30, 1944, Q. I. Roberts and Virginia S. Roberts each are liable for the payment of such deficiencies as transferees of the assets of Roberts Chevrolet Company to the extent of the fair market value of the property and assets received by each of them from Roberts Chevrolet pursuant to a plan of liquidation effective November 30, 1944. Opinion Issues Nos. 1 and 2 The first issue herein involves a determination of the respective interests of Q. I. Roberts and Virginia S. Roberts in Roberts Chevrolet Company, and the taxability of the capital gain resulting from its liquidation on November 30, 1944. Upon a determination that 100 per cent of the capital stock was owned by Q. I. Roberts throughout the corporation's existence, respondent has taxed to him the full amount of the capital gain realized upon its dissolution in 1944. Petitioner, on the other hand, contends that *309 he and his wife, Virginia, have each owned a one-half interest in the company since its inception and that the capital gain in question may properly be divided equally between them for income tax purposes. Respondent's determination is based primarily upon the fact that the original Articles of Incorporation, the corporate minutes, and various representations as to stock ownership made in the corporate tax returns indicate that from August 10, 1939, the date of incorporation, until September 1, 1944, Q. I. Roberts owned 23 shares and that Virginia S. Roberts and Ethel Roberts held one share each. From the record as a whole, we are convinced that Q. I. and Virginia Roberts, in acquiring the Chevrolet dealership in November, 1938, and in operating it thereafter until November 30, 1944, did so with the understanding that each owned an undivided one-half interest in the business. The original capital used to purchase the dealership came from the sale of their joint interest in St. John's Chevrolet which had been acquired from savings accumulated from the earnings of both and money jointly borrowed from Mrs. Ethel Roberts. Virginia also contributed as much, if not more, in the way of *310 vital full-time services to the management and operation of the business throughout its existence as did her husband, Q. I. Roberts. It was she who managed the office, maintained the books and records, and handled the financial affairs. The petitioners' contention that the business was jointly owned has been substantiated by the testimony of a number of disinterested witnesses who were familiar with the financial affairs of petitioner and Virginia. The attorney who prepared the Articles of Incorporation and the corporate minutes testified at the hearing of the present case and described the circumstances surrounding the stock allocation in controversy. His frank admission that the allocation of stock was made on his own determination without consulting either Q. I. or Virginia Roberts certainly is entitled to great weight in judging the bona fides of the petitioners' contention that the corporate records failed to reflect the understanding between them as to the equal ownership of the business. It is also significant that some of the corporate minutes relied upon by respondent were not prepared until some time within a year after the meetings they purported to record and were not presented *311 to the petitioners for their signatures until September, 1943. No stock certificates were actually issued until September 1, 1944, when 25 shares were issued to petitioner and 25 to Virginia. Respondent further argues that petitioner and Virginia acquiesced in the division of capital stock, as originally set out in the certificate of incorporation and the corporate minutes, by their representations as to the stock ownership of the company in its corporate tax returns. Although it is true that the company's income tax returns for the fiscal years ending November 30, 1940, 1941, 1942, and 1943, disclose that Q. I. Roberts was credited with holding more than 50 per cent of the voting stock, we fail to perceive how we may attach any more importance to these returns than to the corporate charter and minutes in determining whether Virginia owned a one-half interest in the company. Such representations admittedly reflected the ownership as it was then recorded in the corporate records, and the stock ownership as reported resulted in no tax advantage to the corporation or to petitioner and Virginia individually. In Reuben Stiefel, 9 T.C. 576 [Dec. 16,039], this Court refused *312 to give effect to stock book entries which indicated that the petitioner owned 99 per cent of the shares of the corporation where from the evidence adduced at the hearing it appeared that he and his wife, in acquiring and operating the company, intended to do so on a 50-50 basis. In that case our holding was as follows: "As between petitioner and Adah, their understanding and agreement as to 50-50 ownership and participation is controlling, and not the stock book entries. The certificates, at least with respect to petitioner and Adah, do not appear to have been issued in any event. They were not signed by the president, nor do they bear a corporate seal. Even if they had been issued, we think, in view of the clear and undisputed intentions of petitioner and Adah, that petitioner would have to be deemed to have held the stock in trust for Adah with respect to her one-half interest. Respondent, in our opinion, is relying on book entries and ignoring the intent of the parties. We have found that the parties intended to acquire equal interests in the company, and we can see no reason for not recognizing or giving effect to their intention. They both contributed substantial capital to *313 the common fund and both gave full time services. Under these circumstances, we can find no element of lack of bona fides, and, therefore, we have concluded and hold that petitioner and Adah did in fact each acquire a one-half interest in the company." From an examination of all the facts, it is clear that the real understanding and agreement between Q.I. and Virginia Roberts was to the effect that each owned a one-half interest in Roberts Chevrolet Company. The inconsistent entries in the corporate records and tax returns do not form a sufficient basis for disregarding this intention. Therefore, the respondent was in error in taxing the entire amount of the capital gain realized upon the liquidation of the Roberts Chevrolet Company in 1944 to Q. I. Roberts. He and Virginia each may properly report one-half of the capital gains which will ultimately be determined in accordance with our opinion herein. As we have stated in our findings, the total capital investment made by the petitioner and Virginia in the company was $4,200. The question of whether Q. I. Roberts received a return of capital in the amount of $3,700.14 in 1941 which would serve to reduce his cost basis of the stock *314 he owned in Roberts Chevrolet Company will be determined at a later point herein. The second issue concerns the amount of $275.55 by which respondent has increased the taxable income of Q. I. Roberts for the year 1944. Initially, respondent increased the taxable income of Roberts Chevrolet Company for 1944 by the amount of $551.11 which was distributed to Q. I. and Virginia Roberts by Roberts Chevrolet as their share of that partnership's income for the period August 1, 1944, to November 30, 1944, under the authority of section 45 of the Internal Revenue Code. Petitioners have withdrawn their original objection to this adjustment. Respondent has also determined that the entire amount constituted a taxable dividend to Q. I. Roberts but as he had already reported $275.56 of this amount on his 1944 income tax return, only $275.55 was added to his taxable income for 1944 as computed in the deficiency notice. We have already found herein that throughout the entire corporate existence of Roberts Chevrolet Company Q. I. and Virginia Roberts each owned a one-half interest in that company. The $551.11 was distributed to the petitioners in proportion to the equal interest *315 of each in the company. No claim has been made by them that the amounts so distributed did not constitute ordinary income to them in 1944. There is no basis for taxing the entire amount to Q. I. Roberts other than respondent's contention that he was the owner of all of the capital stock of Roberts Chevrolet at the time of the distribution. As we have already rejected this argument and the petitioners have reported half of the amount in controversy in their 1944 income tax returns, it follows that the respondent's determination that the entire amount is taxable to Q. I. Roberts is in error. Findings of Fact Issues Nos. 3 and 4 During the summer of 1940 construction was started at Camp Blanding, an Army cantonment located approximately 18 miles from Green Cove Springs. Initially, trucks were hired from various individuals under a separate contract with each which provided that when the rental paid on each truck equalled a stated value the Government had the privilege of claiming the truck under a so-called "recapture clause." The individual owners protested when the Government first exercised its option and took over a number of the trucks. Thereafter, the trucks so claimed *316 were returned and further operations of this nature were conducted under a contract concluded October 16, 1940, between Starrett Brothers and Eken, Inc., the general contractors, and a partnership consisting of Q. I. Roberts and J. P. Hall. This contract included a similar recapture clause which provided in part as follows: "When and if the total rental paid to the Lessor for any piece of equipment shall equal the value thereof, plus one percent per month for each month or fraction thereof such piece of equipment shall have been in use, no further rental shall be paid to the Lessor and title shall vest in the Government." Drivers were furnished by the contractors, but the owners were required to keep their trucks in good repair. All trucks which were used in the Camp Blanding operations, including trucks placed there by persons not interested in the Roberts-Hall partnership and having no relation to any of the persons therein, were placed under the basic Roberts-Hall contract with Starrett Brothers and Eken, Inc., as the general contractors wanted to handle all of such matters through one organization. Q. I. Roberts, individually or as a partner in the following partnerships, *317 supplied trucks to the Camp Blanding project as follows: No. of
Name
Trucks
Make and Place Purchased
Q. I. Roberts
4
3 Chevrolets and 1 Ford purchased from Roberts Chevrolet
Co.
Q. I. Roberts and J. P. Hall
37
Chevrolets - purchased from Roberts Chevrolet Co.
Q. I. Roberts, J. P. Hall and
Gustafson Motor Co.
61
4 Chevrolets - purchased from Roberts Chevrolet Co.;
57 Fords - purchased from Gustafson Motor Co.
J. P. Hall was sheriff of Clay County, Florida, and president of the Bank of Green Cove Springs. The Gustafson Motor Company was the Ford dealer in Green Cove Springs. Q. I. Roberts reported in his 1941 return under "Rents and Royalties" an item of $3,003.91 which represented the income from four vehicles which he individually used at the Camp Blanding project. These four units were purchased by Q. I. Roberts from Roberts Chevrolet Company which made a profit on the sale of each. In his 1941 income tax return Q. I. Roberts also reported $8,085.05, which represented his distributive share of the income of a partnership owned equally by himself and J. P. Hall. The income of this partnership was earned by the rental and sale of 37 *318 trucks in connection with the Camp Blanding construction. Each of these trucks was a Chevrolet and was purchased from Roberts Chevrolet Company. In his 1941 income tax return Q. I. Roberts reported $10,665.67, which represented partnership income distributable to him from a partnership in which he, J. P. Hall, and the Gustafson Motor Company owned equal interests. This partnership supplied 61 trucks, 4 of which were Chevrolets purchased from the Roberts Chevrolet Company and 57 of which were Fords purchased from Gustafson Motor Company. The 41 Chevrolet trucks, 37 of which went to the Roberts-Hall partnership and 4 of which went to the Roberts-Hall-Gustafson partnership, were sold by Roberts Chevrolet Company on a wholesale discount basis authorized by the company's contract with General Motors. The total gross profit realized by Roberts Chevrolet Company from the sale of the 41 trucks was $1,887.08. Roberts Chevrolet Company attempted unsuccessfully to finance the purchase of these trucks through the General Motors Acceptance Corporation. Thereafter, Q. I. Roberts approached J. P. Hall, president of the Bank of Green Cove Springs, and it was decided by them to purchase and operate *319 the trucks on their individual account. Five of the trucks were purchased for cash, 24 were financed through the C.I.T. Corporation, and 12 were financed through the Bank of Green Cove Springs on credit arranged by J. P. Hall. The title certificates covering these trucks were issued in the name of Q. I. Roberts and the names of Q. I. Roberts and J. P. Hall, and no title certificates were retained in the name of the Roberts Chevrolet Company. The Roberts Chevrolet Company did not own any interest in the Roberts-Hall or Roberts-Hall-Gustafson partnerships, nor did it own any interest in the individual transaction involving the rental and sale of four trucks handled by Q. I. Roberts individually. J. P. Hall at no time owned any stock or any interest in the Roberts Chevroolet Company. The Roberts Chevrolet Company at no time owned any stock or interest in the Gustafson Motor Company, nor did the Gustafson Motor Company own any stock or interest in the Roberts Chevrolet Company. All money paid for the rental and sale of trucks at Camp Blanding by Starrett Brothers and Eken, Inc., was paid to the partnership of Roberts and Hall, and was placed by them in the "Roberts Hall Truck Account" *320 in the bank of Green Cove Springs. This bank account was used in connection with all of the truck operations at Camp Blanding, including not only those in which Roberts, Hall and the Gustafson Motor Company were interested, but those in which complete outsiders were involved. The books which were kept for these truck operations were kept by Mr. Gustafson at the Gustafson Motor Company and consisted only of a checkbook and time records showing the number of hours each particular truck was rented. These books were kept separate and distinct from the Roberts Chevrolet Company books and neither the Roberts Chevrolet Company, Q. I. Roberts, nor Virginia Roberts had any control or supervision over the records of the "Roberts Hall Truck Account." All distribution checks on this account were prepared by Mr. Gustafson and were signed by J. P. Hall who was the only person authorized to write checks on this account. No part of the $3,003.91 received by Q. I. Roberts from the rental and sale of four trucks individually at Camp Blanding, or the $8,085.05 or $10,665.67 which represented his distributive share of the Roberts-Hall and Roberts-Hall-Gustafson partnerships, respectively, was deposited *321 in the bank accounts or carried on the books or records of the Roberts Chevrolet Company. This money was deposited in the personal joint checking account of Q. I. and Virginia S. Roberts in the Bank of Green Cove Springs. Roberts Chevrolet Company supplied, at regular prices, parts and repair service for a number of the trucks used in the Camp Blanding projects. For a while it kept a mechanic at the project to work on the trucks. The indebtedness owing by the partnerships to Roberts Chevrolet Company was paid to the petitioner and Virginia individually and they in turn reimbursed the corporation in full for the accessories and repairs supplied by it. After October, 1940, until the summer of 1941 when the work at Camp Blanding was completed, petitioner devoted most of his time to the truck rental projects, going to Camp Blanding almost every day. In Docket Nos. 15773 and 15774, respondent included, under the provisions of section 45 of the Internal Revenue Code, as income to the Roberts Chevrolet Company for the fiscal year ended November 30, 1941, the amounts of $3,003.91, $8,085.05 and $10,665.67, reported in that year by Q. I. Roberts on his individual *322 income tax return as the profit realized by him from the rental and sale of certain trucks at Camp Blanding. Respondent further held that of the amount of $21,754.63, which represented the profit realized by Q. I. Roberts in 1941 from the rental and sale of certain trucks and which the respondent determined was taxable to the Roberts Chevrolet Company under the provisions of section 45, $18,054.49 constituted a taxable dividend received by Q. I. Roberts from the Roberts Chevrolet Company in the year 1941. Respondent determined that the remaining amount, or $3,700.14, represented a return of capital which would serve to reduce the petitioner's basis of the stock he owned in Roberts Chevrolet Company. Opinion Issues Nos. 3 and 4 In computing the tax liability of Roberts Chevrolet Company for the fiscal year ended November 30, 1941, respondent has allocated to the corporation under the provisions of section 45 of the Internal Revenue Code the income reported by Q. I. Roberts from the sale and rental of certain trucks at Camp Blanding, and his distributive share of the profits of two other partnerships which were engaged in similar operations during 1941. *323 Section 45* authorizes the respondent to distribute, apportion, or allocate gross income between or among two or more businesses that are owned or controlled directly or indirectly by the same interests, if he determines that such an allocation is necessary to prevent the evasion of taxes or clearly to reflect income. Where the respondent has made such a determination, the burden rests upon the taxpayer to prove that the Commissioner's determination was arbitrary and that its situation is not one to which the statute applies. Seminole Flavor Co., 4 T.C. 1215; Briggs-Killian Co., 40 B.T.A. 896; Welworth Realty Co., 40 B.T.A. 97. *324 The important consideration herein is whether the individual enterprise of Q. I. Roberts and the partnerships of which he was a member were real for all purposes and at all times functioned as completely separate economic entities. Buffalo Meter Co., 10 T.C. 83. It has been generally held that the separateness of a corporation from its stockholders will be respected in tax matters, even when there is but one stockholder. Ross v. Commissioner, 129 Fed. (2d) 310. Upon the facts of the present case, we are convinced that the situation here was not a sham or unrealistic arrangement designed to evade or reduce taxes. The several truck rental businesses were organized for sound business reasons and no part of the profits realized therein can in any way be said to have been earned by the corporation to which the respondent proposes to tax such earnings. The truck rental business engaged in by the partnerships and Q. I. Roberts individually was not an activity previously conducted by Roberts Chevrolet Company but was undertaken specifically to meet the temporary needs of the Army in its construction of Camp Blanding. Cf. Buffalo Meter Co., supra., Miles-Conley Co., 10 T.C. 754. *325 The books and records of the partnerships were kept by Mr. Gustafson at the Gustafson Motor Company and were not subject to the control or supervision of the Roberts Chevrolet Company or Q. I. or Virginia Roberts. All money received from the rental and sale of trucks was placed in the "Roberts-Hall Truck Account" and all checks drawn on this account were prepared by Mr. Gustafson and signed by J. P. Hall who was the only person authorized to write checks on this account. Cf. Forcum-James Co., 7 T.C. 1195. Respondent has based his allocation of Q. I. Roberts' income from these enterprises to the Roberts Chevrolet Company principally upon the fact that the four trucks operated by Q. I. Roberts individually, the 37 trucks operated by the Roberts-Hall partnership, and four of the 61 trucks used by the Roberts-Hall-Gustafson partnership were purchased from the Roberts Chevrolet Company. Petitioners have shown to our satisfaction that a profit was made on each of the trucks sold to Q. I. Roberts and the partnerships. The trucks supplied to the Roberts-Hall and Roberts-Hall-Gustafson partnership were sold by the company on a wholesale discount basis authorized by the company's *326 contract with General Motors. The evidence before us leads us to the conclusion that these transactions were bona fide sales and that the purchasers could have obtained the same number of vehicles on the same terms from nearly any Chevrolet dealer at that time. It is also apparent from the record that parts and repairs supplied to these projects by the Roberts Chevrolet Company were made at regular prices and although at times substantial sums were owing to the company for these services, it was eventually compensated in full. We are also of the opinion that in the present situation there did not exist sufficient "control" in respect to the Roberts-Hall and Roberts-Hall-Gustafson partnerships to sustain the applicability of section 45. We have already determined herein that Q. I. Roberts possessed only a one-half interest in the Roberts Chevrolet Company during 1941 and it is obvious that he owned no more than a one-half interest in the Roberts-Hall partnership and a one-third interest in the Roberts-Hall-Gustafson partnership. The record shows that neither J. P. Hall nor the Gustafson Motor Company at any time owned any stock or interest in the Roberts Chevrolet Company. For these *327 reasons we are of the belief that the Roberts Chevrolet Company and the partnerships were not "owned or controlled directly or indirectly by the same interests" within the meaning of section 45. In view of what we have said herein, it follows that the respondent was in error in increasing the taxable income of Roberts Chevrolet Company for the fiscal year ended November 30, 1941, in the amounts of $3,003.91, $8,085.05, and $10,665.67 which represented the profits realized by Q. I. Roberts in 1941 from his operations involving the sale and rental of trucks at Camp Blanding. Having found herein that these amounts were improperly attributed by respondent to the Roberts Chevrolet Company in the year 1941, it is apparent that the respondent's determination that Q. I. Roberts received a dividend in the amount of $18,054.49 and a return of capital in the amount of $3,700.14 from the Roberts Chevrolet Company was in error. Findings of Fact Issue No. 5 In November or December, 1940, a partnership known as "H. L. Lynch, Gustafson Motor Company, J. P. Hall, Q. I. Roberts, and Virginia S. Roberts" was formed to engage in the rental and sale of trucks in connection with the construction *328 of Camp Blanding. This partnership supplied approximately 385 Ford trucks to the project. The partnership in question was formed in November or December, 1940, at a meeting held at the Gustafson Motor Company in Green Cove Springs. Virginia Roberts was not present at this meeting. The original agreement between the parties was oral but it was understood that Lynch, the Gustafson Motor Company and J. P. Hall each owned a one-fourth interest and that Q. I. Roberts and Virginia S. Roberts together held a one-fourth interest. Subsequently, at the suggestion of Lynch, the following written agreement was executed by the parties on February 1, 1941: "THIS MEMORANDUM AGREEMENT, Made as of the 1st day of February, A.D. 1941, by JOHN HALL, GUSTAFSON MOTOR COMPANY, HAL LYNCH, Q. I. ROBERTS and VIRGINIA S. ROBERTS, his wife; "WITNESSES, That the parties hereto agree that the said John Hall, Gustafson Motor Company and Hal Lynch each owned an undivided one-fourth interest in and to the Motor Trucks described on the Schedule hereto attached and by reference made a part hereof, and the said Q. I. Roberts and Virginia S. Roberts, his wife, together own an undivided one-fourth interest in and *329 to said Trucks. "IN WITNESS WHEREOF, the parties hereto have executed this agreement the day and year first above written." This agreement was signed by Hal Lynch, J. W. Gustafson, for Gustafson Motors, J. P. Hall, Q. I. Roberts and Virginia Roberts. This agreement in no way varied the original oral agreement between the parties. All of the trucks involved in this partnership were Fords purchased from the manufacturer through the H. L. Lynch Motor Company and the Gustafson Motor Company. Initially, none of the partners contributed any cash towards the purchase of these trucks. The purchase was financed through the Universal Credit Company and the Investment Securities Company upon the execution by Q. I. Roberts, H. L. Lynch, J. P. Hall, and Gustafson Motor Company of notes and guarantees to each of the companies. It was agreed that all rental receipts of the partnership were to be applied to the indebtedness due to the finance companies until they had been repaid in full. Virginia S. Roberts did not sign the guarantees given to the finance companies. Thereafter, Q. I. Roberts spent all of his time at Camp Blanding keeping the trucks rented, supervising their operation, and *330 arranging for their repair. Virginia Roberts continued to work at the Roberts Chevrolet Company and devoted all of her time to its business. Her duties were substantially increased as a result of the petitioner's activities at Blanding. All of the trucks rented by the partnership to the contractors at Camp Blanding were not claimed under the provisions of the recapture clause. A number of the trucks were turned back to the partnership and were sold on a used car lot operated by the partnership in Green Cove Springs. The partnership records, consisting of a time book and checkbook, were maintained and kept by Gustafson at Gustafson Motor Company. Partnership receipts were deposited in the "Hall and Roberts Truck Account" at the Bank of Green Cove Springs. J. P. Hall was the only person authorized to write checks on this account. The partnership filed an income tax return for the calendar year 1941 which disclosed the following income and distributions: Net income
$177,920.73
Distributions: H. L. Lynch (25%)
$ 44,480.18
Gustafson Motor Co. (25%)
44,480.18
J. P. Hall (25%)
44,480.18
Q. I. Roberts (12 1/2%)
22,240.09
Virginia S. Roberts (12 1/2%)
22,240.10
$177,920.73
*331 Between May 23, 1941, and January 28, 1942, J. P. Hall issued checks on the "Roberts and Hall Truck Account", payable to Q. I. Roberts and Virginia S. Roberts jointly, in the total amount of $46,040.19. This amount represented their share of partnership income of $44,480.19 and $1,560 as reimbursement for expenditures made by them in behalf of the partnership and was deposited by them in their joint checking account at the Bank of Green Cove Springs. The deficiency notice in Docket No. 15775 states: "It is held that for tax purposes Virginia S. Roberts is not a member of the partnership, H. L. Lynch, Gustafson Motor Company, J. P. Hall, Q. I. Roberts and Virginia S. Roberts, and that your distributive share of the net income of such partnership for the year 1941 is $44,480.19." Opinion Issue No. 5 Respondent has increased the taxable income of Q. I. Roberts for the year 1941 in the amount of $22,240.10, which represents that portion of the income of a partnership known as "H. L. Lynch, Gustafson Motor Company, J. P. Hall, Q. I. Roberts and Virginia S. Roberts" which was received and reported by Virginia S. Roberts in 1941. It is respondent's contention that for tax purposes *332 Virginia Roberts was not a bona fide member of the partnership and that her share of the partnership income should be taxed to her husband, Q. I. Roberts. Petitioner maintains that he and Virginia were bona fide partners as to a one-fourth interest in the partnership and that the income arising from that interest was properly reported, one-half by Virginia and one-half by him, in their respective 1941 income tax returns. The facts in the instant case do not require an exhaustive analysis of the many cases decided by the courts involving socalled family partnerships. As was stated by the Supreme Court in Commissioner v. Tower, 327 U.S. 280: "There can be no question that a wife and a husband may, under certain circumstances, become partners for tax, as for other, purposes. If she either invests capital originating with her or substantially contributes to the control and management of the business, or otherwise performs vital additional services, or does all of these things she may be a partner as contemplated by 26 U.S.C. §§ 181, 182 * * *. A wife may become a general or a limited partner with her husband. But when she does not share in the management *333 and control of the business, contributes no vital additional service, and where the husband purports in some way to have given her a partnership interest, the Tax Court may properly take these circumstances into consideration in determining whether the partnership is real within the meaning of the federal revenue laws." Petitioner contends that Virginia S. Roberts contributed as much capital to the partnership in question as he did. It is true that no one in the partnership actually invested any cash in the enterprise. The trucks were secured by the execution of notes and guarantees to the Universal Credit Company and the Investment Securities Company, and were signed by Q. I. Roberts, H. L. Lynch, J. P. Hall, and the Gustafson Motor Company. Although Virginia did not sign the notes or guarantees given to the finance companies, it is the petitioner's contention that he and Virginia considered the signature of Q. I. Roberts sufficient to pledge the property of both as security for the credit extended in the purchase of the partnership equipment. With this line of reasoning we cannot agree. Regardless of whatever impression the petitioner and Virginia may have had of this transaction, *334 we are convinced that the signature of Q. I. Roberts alone on the guarantees would have in no way subjected the separate estate of Virginia, or her interest in property jointly held, to the repayment of the moneys borrowed. 708.02, Florida Statutes, 1941; Matthews v. McCain, 170 So. 323. Consequently, it is our opinion that Virginia contributed nothing in the way of capital to this partnership. The record clearly demonstrates that Virginia Roberts contributed no direct services to the operation or management of the partnership. Petitioner advances the argument that by relieving him of his duties at the Roberts Chevrolet Company and thereby making it possible for him to devote his entire time to the partnership, Virginia indirectly rendered vital, substantial, and necessary services in the earning of the partnership income. It is our opinion that the indirect benefit derived by the partnership from Virginia's increased activity at the Roberts Chevrolet Company was too remot to be considered by us as vital additional services to the partnership within the meaning of that standard as applied under the principle of the Tower decision. The evidence also indicates that Virginia *335 was not present at the conference held at the Gustafson Motor Company at Green Cove Springs in November or December 1940 when the partnership in question was formed, nor is there any evidence that throughout the existence of the partnership she participated in the control or management of the business or the formation of its policies. There can be no doubt that the partnership income in question was actually earned by Q. I. Roberts. The one-fourth interest in the partnership which he claims was equally owned by himself and his wife was acquired by his signature on the notes and guarantees. It was he who managed, controlled, and supervised the operation of the trucks at Camp Blanding and contributed the vital services necessary to the success of the business. Each check representing the alleged one-fourth interest of petitioner and Virginia in the profits of the partnership was made payable to Q. I. and Virginia S. Roberts jointly and was deposited by them in their personal joint checking account in the Green Cove Springs Bank. Under those circumstances, it is clear that the partnership brought about no real change in the economic relation of the husband and wife to the income in *336 question. The memorandum executed by the parties on February 1, 1941, which purports to affirm the interest of Virginia in the partnership, did not alter the actualities of the relation of the parties to the income. As the evidence in the instant case indicates that Virginia contributed no capital, no vital and necessary services, and did not contribute to the management and control of this partnership, we are of the opinion that under the principle of Commissioner v. Tower, supra, she was not a bona fide member of the partnership during 1941 and that the income of that partnership distributed to her in that year was properly taxable to her husband, Q. I. Roberts. Petitioner further contends that by virtue of the written agreement between the members of the partnership, dated February 1, 1941, an undivided one-fourth interest in the trucks was held thereafter by him and his wife as an estate by the entireties under Florida law. Petitioner has brought to our attention a number of cases of this Court and other authority wherein it has been held that income produced by property held by the entireties is taxable half to the husband and half to the wife. Edwin F. Sandberg, 8 T.C. 423; *337 Walter G. Morley, 8 T.C. 904; Paul G. Greene, 7 T.C. 142; George K. Brennen, 4 T.C. I.T. 3235, 1938-2 C.B. 160. We believe that a discussion of these cases is unnecessary in our determination herein as the evidence before us does not support the conclusion that an estate by the entireties arose between petitioner and his wife in the trucks used in the Blanding operation. An estate by the entireties involves the unities of time, title, interest and possession, as well as the husband and wife unity of ownership. 26 Am. Jur. 698; Johnson v. Landefeld, 189 So. 666; Andrews v. Andrews, 155 Fla. 654, 21 So. 2d 205. The rule in Florida, as expressed in Bailey v. Smith, 89 Fla. 303, 103 So. 833, is as follows: "Under the law in force in this state there may be a tenancy by entireties in both real and personal property; and whether such an estate exists as the result of the acquisition of property by and in the names of both husband and wife must be determined by a consideration of the nature and terms of the transaction as portraying the intent of the parties and of the rules of law applicable thereto." *338 Petitioner points to the fact that the written instrument between the members of this partnership, dated February 1, 1941, specifically recites that "said Q. I. Roberts and Virginia S. Roberts, his wife, together own an undivided one-fourth interest in and to said Trucks", and contends that this language clearly evidences an estate by the entireties under Florida law. The nature of the arrangement whereby the trucks in question were acquired by the partnership, the manner in which the business was operated, and the ultimate disposal of these trucks would rather indicate that the parties intended that no relationship other than a partnership was to exist between them. In our opinion, the original parol agreement which the parties testified was embodied in the written agreement of February 1, 1941, was not capable of giving rise to a tenancy by the entireties. The written instrument relied upon by petitioner is merely declaratory of the general partnership arrangement and does not purport to be a conveyance or to accomplish the transfer of the ownership of the trucks. Although H. L. Lynch testified to the effect that this instrument was the only document evidencing the ownership *339 of the truck by the partners, it is obvious that under this transaction title to the trucks initially must have passed from the Ford Motor Company either to the partnership, some member of the partnership, or to the finance companies. In our opinion, Florida law would operate to give rise to a tenancy by the entireties in these trucks only upon those conveyances which actually effected the change in title. The record before us does not reveal in whose name the title to these trucks was vested at any stage of the partnership's operations but the fact that H. L. Lynch considered the instrument executed on February 1, 1941, necessary to reflect the real ownership in the trucks may well indicate that the record title was not the same as shown in the agreement between the parties. On all of the facts of the record before us, it is our opinion that petitioner has failed to show that a tenancy by the entireties arose between himself and Virginia Roberts in the ownership of these trucks. The respondent's determination that $22,240.10 distributed to Virginia Roberts in 1941 by the Lynch, Gustafson, Hall, Roberts partnership was taxable to the petitioner must be sustained. Findings of Fact
*340 Issue No. 6 Shortly before Q. I. Roberts and Virginia S. Roberts moved from Palatka to Green Cove Springs in 1938, they became engaged in the cattle business, hereinafter referred to as the Roberts Cattle Ranch. This business consisted of the buying, raising, and selling of cattle and was conducted on a ranch located about 33 miles from Green Cove Springs. The Roberts Cattle Ranch was started with $500 borrowed by Virginia from her sister, Mrs. Roy Romines, in May, 1938. This loan was used by petitioner and Virginia to purchase tax sales certificates through the Clerk of the Circuit Court of Putnam County on 3,980 acres of vacant land. The remainder of the loan was used by them to pay the cost of publishing legal notices in connection with the tax sales certificates and for the purchase of wire which was used in fencing the land for use as a pasture. In July, 1938, Virginia traveled to Washington, D.C., for the purpose of borrowing an additional $2,500 from her sister. This $2,500 loan was used in the purchase of approximately 90 head of cattle for the ranch. These were the first cattle purchased and represented the actual start of their cattle operations. Petitioner and *341 Virginia expanded their cattle operations, buying more land and more cattle with money saved from their earnings, and loans obtained from the Jacksonville Production Credit Association. During the period November 8, 1939, through November 27, 1944, various lands in Putnam County were purchased from private owners and the State of Florida pursuant to tax sales certificates. Thirty-six separate deeds were involved in these transactions. The deeds disclose that title to the land purchased for the Roberts Cattle Ranch was vested in the names of Q. I. Roberts and Virginia S. Roberts in estates by the entireties with the exception of approximately 75 acres, title to which was vested in the name of Q. I. Roberts alone. Various loans were obtained by petitioner and Virginia from the Jacksonville Production Credit Association of which A. G. Shands was executive secretary. The moneys borrowed from this Association were evidenced by promissory notes secured by chattel mortgages on the cattle, all of which were signed by both Q. I. Roberts and Virginia S. Roberts. Throughout the period in question the following loans were secured: July 1, 1939
$ 5,300
Feb. 2, 1940
2,600
June 1, 1940
12,000
Mar. 9, 1942
25,000
Sept. 9, 1942
8,000
Feb. 11, 1943
23,350
Apr. 3, 1943
6,150
*342 Virginia also signed, in connection with each loan, the Association's "Application for Livestock Loan" as a joint owner and applicant with her husband. Q. I. Roberts was an experienced and qualified cattle man, having been reared on a farm in Putnam County, Florida, where his father raised cattle and operated a turpentine business. Prior to 1938 Virginia had had no experience in raising cattle. The actual physical labor involved in caring for the cattle was performed by an employee hired for this purpose. Decisions relating to the management of the ranch and its operation were made jointly by both Q. I. and Virginia. From 1942 through 1944, Q. I. Roberts devoted most of his time to the cattle business. Virginia, during this period, had charge of purchasing the supplies for the ranch, checked and kept the ranch records, and paid its bills by checks drawn on the joint checking account which she and Q. I. Roberts maintained at the Bank of Green Cove Springs. The checks used for the cattle business were inscribed "Q. I. Roberts - Cattle, Green Cove Springs, Florida". Q. I. Roberts and Virginia S. Roberts filed an amended joint income tax return for the calendar year 1939, reporting *343 a net income of $3,624.22 from "Cattle operations". For 1940 and 1941, they filed separate individual income tax returns and a profit of $940.91 for 1940 and a loss of $13,382.08 was reported on the returns of Q. I. Roberts. For the year 1942 and subsequent years partnership information returns were filed in the name of the Roberts Cattle Ranch and all income and gains or losses were thereafter divided equally between Q. I. Roberts and Virginia S. Roberts. When petitioner and Virginia went to Milligan & Burke, accountants, for the purpose of having the 1940 income tax returns prepared, they had no regular books of account for the ranch. The tax returns were prepared from a list of receipts and disbursements compiled by Virginia from checks drawn on their joint personal checking account. Neither petitioner nor Virginia informed Milligan that anyone other than Q. I. Roberts was interested in the business. Regular books for the ranch operations were set up by an accountant in Milligan's office in the spring of 1941 as of January 1, 1941, and were turned over to Virginia about May 7, 1941, and thereafter she kept these books. These books as originally set up did not indicate that Virginia *344 had any interest in the cattle. Closing the books for 1941, Milligan noted that Virginia's share of $22,240.10 of the Lynch, Gustafson, Hall and Roberts partnership income and the sum of $1,300 which was received by Virginia as salary from the Roberts Chevrolet Company, had been expended by her in the purchase of additional lands and cattle for the ranch. As of December 31, 1941, a net worth account in these amounts was opened in the name of Virginia on the books. Milligan then suggested to the parties that if they were operating the ranch as a partnership, a partnership return for 1942 should be filed and that the partnership understanding should be reduced to writing. On March 11, 1943, an instrument was executed by petitioner and Virginia reciting that the farming and cattle business was and would continue to be operated as a joint enterprise, and that petitioner and Virginia each owned an undivided one-half interest in the real and personal property used in the business. This agreement credited Virginia with an investment of not less than $23,000. The Roberts Cattle Ranch realized the following profits and losses during the period 1939 to 1944, inclusive: Net Loss
Net Profit
1939
$ 3,624.22
1940
940.91
1941
$13,382.08
1942
10,780.81
1943
9,234.32
1944
1,254.40
*345 The deficiency in Docket No. 15775 shows that the respondent has added to the net income of Q. I. Roberts for the taxable year ending December 31, 1942, the sum of $5,390.40, that portion of the profits from the Roberts Cattle Ranch which was reported by Virginia in that year. The deficiency notice states: "It is held that the entire net income realized by the business operated under the name of Roberts Cattle Ranch is taxable to you." The amount of $4,617.16 which represented that portion of the income from the Roberts Cattle Ranch distributed to Virginia in 1943 was also added to the net income of Q. I. Roberts for the taxable year ended December 31, 1943. Petitioner has conceded in his reply to respondent's amended answer that if Q. I. and Virginia Roberts are found to have been bona fide partners during the taxable years 1942, 1943, and 1944 in the operation of the Roberts Cattle Ranch, they were also bona fide partners in that enterprise during 1941, and that under such circumstances he is entitled to a deduction of only one-half of the loss of $13,382.08 sustained by the Roberts Cattle Ranch in 1941 in computing his net income for that year. Opinion Issue No. 6 *346 The final issue herein concerns the question of whether for income tax purposes Virginia S. Roberts was a partner with her husband, Q. I. Roberts, in the operation of the Roberts Cattle Ranch during the years 1942, 1943, and 1944. It has been stated that the test in determining the bona fide character of a family partnership is "to assertain whether the partners really and truly intended to join together for the purpose of carrying on a business and sharing in its profits, or whether the partnership was a mere sham utilized solely for the purpose of reducing a taxpayer's true tax liability by a pretended distribution of income." Isaac Blumberg, 11 T.C. 663; Commissioner v. Tower, supra; Lusthaus v. Commissioner, 327 U.S. 293. Whether the wife either invests capital originating with her or substantially contributes to the control and management of the business or otherwise performs vital additional services, or does all of these things, are critical considerations in making such a determination. Commissioner v. Tower, supra; Walsh v. Commissioner, 170 Fed. (2d) 535. Respondent has determined deficiencies for the *347 years 1942 and 1943 against Q. I. Roberts by holding that the entire net income realized by the business operated under the name of Roberts Cattle Ranch was taxable to him. Petitioner contends that from the inception of the cattle business in the summer of 1938 and throughout the years here in issue the Roberts Cattle Ranch was operated as a bona fide partnership in which he and Virginia each owned a one-half interest. We are of the opinion that the record clearly supports petitioner's contention. The initial investment of $500 in the cattle business was borrowed by Virginia from her sister. Later an additional $2,500 was borrowed by Virginia from the same source. This $3,000 was used in the purchase of cattle, wire, and tax sales certificates, and the publishing of legal notices in connection with the acquisition of land. With the exception of approximately 75 acres, title to the land used in connection with the cattle business was vested in the name of Q. I. Roberts and Virginia S. Roberts as tenants by the entireties. A number of sizeable loans were secured by petitioner and Virginia for ranch purposes from the Jacksonville Production Credit Association. Virginia signed the *348 applications for these loans as a joint owner and applicant with her husband and signed the promissory notes and chattel mortgages which were executed pursuant to these transactions. It also appears from the record that substantial portions of her income during the years in question found its way into the cattle business by way of withdrawals made from a joint checking account wherein money that she held in her own right had been deposited. We feel that the facts indicate that Virginia made real and substantial contributions of capital to the cattle business. Although the record does not divulge what services Virginia rendered in connection with the cattle operations prior to 1942, it does show that during 1942 and thereafter she performed vital additional services in the management and operation of the ranch. She maintained the books and records for the business, purchased supplies, drew the checks for the payment of business expenses, and shared with her husband the making of decisions in connection with the conduct of the business. We are convinced that petitioner and Virginia "really and truly" intended to join together as partners in the operation of the cattle business and *349 to share equally in its profits and losses. The testimony of both parties to the effect that such an understanding existed was substantiated by the testimony of A. G. Shands, who, as the executive secretary of the Jacksonville Production Credit Association which advanced large sums to petitioner and his wife, had full knowledge of their financial affairs and the ownership of ranch assets. For the most part, the conduct of the parties from the inception of the business and throughout the years in question was consistent with the existence of a partnership. In the light of this conduct, the fact that no formal partnership agreement was executed until March 11, 1943, is of little significance. We think that the situation here is in this respect essentially the same as was presented in Weizer v. Commissioner, 165 Fed. (2d) 772, wherein the court stated: "The Commissioner has successfully contended in many family partnership cases that the formal execution of articles of partnership does not create a partnership for income tax purposes. It is equally true that the failure to execute such articles is not controlling. The nature of the business, its origin, its growth, the *350 work of the parties in their respective fields and their mutual understanding that it was 'our business' easily explain the absence of any formal articles of partnership." Respondent, in support of his determination, stresses the fact that the ranch income for 1939 was filed on an amended joint income tax return and that a profit for 1940 and a loss for 1941 sustained in this business was reported on the income tax returns of Q. I. Roberts for those years. He also points out that the books of the business fail to show that any interest therein was held by Virginia until the close of 1941. The record indicates that no regular books were set up for the cattle business until early in 1941 and that the accounting firm which prepared the records at this time had no knowledge of the ownership of the business. It is true that the inconsistencies shown by the tax returns are entitled to weight in judging the bona fides of petitioner's contention that a valid partnership existed throughout the years in question, however we do not regard them as conclusive evidence of the actual ownership of the ranch or the business relationship of the parties. On the record as a whole, we are of the opinion *351 that the original capital contribution of Virginia, the services rendered by her in the business, her assumption of equal liability for the indebtedness incurred in its operation, and the uncontradicted testimony of the parties and of disinterested witnesses as to the understanding and conduct of petitioner and Virginia, more than outweigh any inference that might be drawn from the tax returns. It is, therefore, our opinion that from the inception of the business in 1938 to and including 1944, Q. I. and Virginia Roberts were bona fide partners in the operation of the Roberts Cattle Ranch and each owned an undivided one-half interest therein. Respondent's addition of $5,390.40 and $4,617.16 to the taxable income of Q. I. Roberts for the years 1942 and 1943, respectively, was in error. However, as we have held herein that a valid partnership existed during 1941, Q. I. Roberts, in computing his net income for 1941, is entitled to claim a deduction of only one-half of the loss of $13,382.08 sustained by the Roberts Cattle Ranch in that year. Decision will be entered under Rule 50. Footnotes
*. Internal Revenue Code: SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.↩